**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| ABDUL K. TAWWAAB, *et al.* | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | Civil Action No. AW-09-00553 |
| | * | |
| VIRGINIA LINEN SERVICE, INC., *et al.*, | * | |
| | * | |
| | * | |
| Defendants. | * | |
| | * | |

**************************************************************************

<u>**MEMORANDUM OPINION**</u>

Plaintiffs Abdul K. Tawwaab ("Tawwaab") and Kenneth E. Carter ("Carter") bring this action against Defendants Virginia Linen Services, Inc. ("VLS"), Lee Gwaltney ("Gwaltney"), and Charles Miller ("Miller") alleging discrimination on the basis of race and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e ("Title VII") and 42 U.S.C. § 1981. Plaintiff Carter also alleges intentional infliction of emotional distress. Currently pending before the Court are Defendants' Motion for Summary Judgment (Doc. No. 52) and Plaintiffs' Motion for Leave to File Third Amended Complaint and for Joinder of Additional Party (Doc. No. 42). The Court has reviewed the entire record, as well as the pleadings and exhibits, with respect to the instant motions. The issues have been briefed, and no hearing is deemed necessary. *See* Local Rule 105.6 (D. Md. 2008). For the reasons stated more fully below, the Court will GRANT in part and DENY in part Defendant's Motion for Summary Judgment and GRANT Plaintiff's Motion for Leave to File Third Amended Complaint and for Joinder of Additional Party.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. Plaintiff Abdul K. Tawwaab

Plaintiff Tawwaab, who is African-American, was hired by Defendant VLS in October of 2005.[1] VLS, a linen and laundry service, is part of the Mohenis family of companies, of which Donald Struminger is chairman of the board and chief executive officer and his son, David Struminger, is president. Defendant Gwaltney serves as the regional vice president overseeing VLS and other Mohenis depots located in Franconia, Virginia, and New Castle, Delaware. Tawwaab worked as a route driver whose direct supervisor was Plaintiff Carter. On August 11, 2006, Tawwaab submitted a letter of resignation to Miller because he was frustrated by what he perceived as poor customer service on the part of VLS. He indicated that his last day of work would be August 25th, but agreed to continue working for VLS until a replacement could be hired and trained, which he did until November 1, 2006.

Tawwaab was responsible for delivering linen to Wakefield Valley Country Club ("WVCC") in Carroll County, Maryland, and did so approximately forty times without incident until October 20, 2006. VLS management had recently switched WVCC's account from credit to "cash only," which required route sales representatives to obtain payment for each delivery before they could leave the clean linen. When Tawwaab arrived at WVCC on October 20th, the general manager, Brian Walsh, met Tawwaab to accept the delivery, at which point Tawwaab informed him he needed to provide payment before Tawwaab could leave the clean linen.

---

[1] Defendants allege that Tawwaab omitted information regarding prior criminal convictions on his employment application, an act that Defendants claim would have prevented them from hiring Tawwaab in the first place. However, Defendants had no knowledge of these facts until after Plaintiffs initiated this lawsuit, and these facts are thus immaterial to the issues on summary judgment and will not be addressed. *See McKennon v. Nashville Banner Publ'g Co.*, 513 U.S. 352, 360 (1995) ("[A]n employer could not have been motivated by knowledge it did not have and it cannot now claim that the employee was fired for the nondiscriminatory reason.").

Tawwaab's insistence on receiving payment allegedly angered Walsh, and so Tawwaab called Gwaltney to get authorization to leave the linen on credit, which Gwaltney provided. Nonetheless, Walsh, who is Caucasian, was still angry and allegedly said:

> [M]an, you been awful uppity all day . . . You know, you're in Westminster [C]ounty [sic], good old boys country . . . [Y]ou know we can take some of these sheets and bring up some of the linen and cut some holes for eyes . . . [a]nd then . . . take some tape and make a cone for a helmet and go get us a rope and find us a tree and have us a good old lynching.

(Doc. No. 63 at 17.) Tawwaab alleges that a waitress at WVCC, Kathy Lee, witnessed this tirade and tried to get Walsh to stop.[2] Tawwaab left immediately.

Tawwaab contacted Gwaltney to report Walsh's comment and was instructed to document his complaint; subsequently, he submitted a written statement to his supervisor, Carter, as well as other members of VLS senior management. Tawwaab also requested that he not be required to make deliveries to WVCC again. As a result, members of the management team assumed the responsibility of making all subsequent deliveries to WVCC. Defendant Miller was on vacation when Tawwaab submitted his initial complaint, and he learned of the incident ten days later, on October 30, 2006, from Robert Carstens ("Carstens"), his assistant general manager. The next day, Miller saw Tawwaab's written complaint and received an e-mail from Donald Struminger inquiring as to what VLS had done to investigate the complaint.

Two days later, on November 1, 2006, Tawwaab was terminated, and the parties offer conflicting theories as to why Tawwaab's employment at VLS came to an end. Plaintiffs allege that on October 31, 2006, Miller instructed Carter to fire Tawwaab, and failed to provide Carter

---

[2] Defendant disputes Plaintiff's description of the events that transpired at WVCC. During the course of VLS's subsequent investigation of the incident, both Walsh and Lee submitted letters that disputed Tawwaab's characterization of what transpired and denied that any racial slurs or threats had ever been made.

with a specific reason. Carter refused to fire Tawwaab because he believed that it would appear as if he were firing Tawwaab because of his complaint. In contrast, Defendants contend that Miller fired Tawwaab as a result of a number of incidents that occurred on October 30th and 31st. Defendants allege that Tawwaab failed to count the number of soiled items he picked up from Applebee's, a customer of VLS, as was required; changed several customers, including Chipotle, MRI UMB, Edies Deli and Grill, and Tatin Brasserie from "cash only" to credit without authorization from management; and failed to make a delivery to Dismas House that Miller eventually delivered himself. On November 1, 2006, Plaintiffs allege that Carstens informed Tawwaab that Miller had terminated him. Defendants argue that Carstens did not terminate him, but instead merely told Tawwaab that, in light of the notice of resignation he had submitted on August 11th, and the incidents described above, there was no need for him to come in anymore. As a result, Tawwaab ceased working at VLS.

## II. Plaintiff Kenneth E. Carter

Plaintiff Carter, who is African-American, was hired by VLS in 2003. In 2005, Carter was promoted to assistant plant superintendent. In early 2005, Carter was promoted to the position of route supervisor. In his capacity as route supervisor, Carter was directly supervised by Miller, who served as the general manager. Carter worked under Miller's supervision until he resigned from his position on February 27, 2007.

Carter alleges that Miller constantly used racial slurs and profane insults in his presence in reference to the African-Americans he supervised that included the terms "dumb," "stupid," "motherfuckers," "black motherfuckers," "bastards," "black bastards," and "black Fresh Princes of Bel-Air." Carter alleges that Miller did not use this type of invective when addressing white

employees. He specifically identifies an incident wherein Miller said of Virgil Wingate, another African-American route sales representative: "I can't stand that black motherfucker. I'm going to kick that black bastard's ass and drag his motherfucking ass across the fucking parking lot, black bastard. I can't stand that motherfucker." (Doc. No. 63 at 7.) Carter was so upset by this incident that he had to leave work for the day to calm down. He also alleges that Miller would repeatedly blame problems in the route department on the fact that the route sales representatives were African-Americans, and would say that he never had these types of problems when he was working in West Virginia, where the majority of his employees were white. Miller also allegedly made racial jokes in Carter's presence about traditional African-American hairstyles and "ethnic-sounding" names. In addition, Miller kept a statue on his desk of what Plaintiffs assert is an African-American golf caddy with the appearance of a monkey, and that Miller would deliberately place this statue in front of Carter and other African-American employees when he would meet with them, as if to say, "This is what I think of you. You are monkeys to me." (Doc. No. 63-4 ¶ 9.) Defendants dispute all of these allegations except for Miller's use of the term "black son of a bitch" in reference to Wingate.

Carter alleges that he complained about Miller's profanity and racial comments on at least seventeen different occasions. Miller was never disciplined as a result. He also argues that Miller deliberately undermined Carter in front of his subordinates, called him a "dumb motherfucker" as often as twice a week, told the drivers not to listen to Carter, and gave them instructions that conflicted with Carter's. In August of 2006, Carter complained again to senior management. He also requested to participate in VLS's "Fast Track" management training program in a meeting with Gwaltney, during which Plaintiffs also allege that Gwaltney offered

to increase Carter's pay.[3]

After Carter's protest of Tawwaab's termination in November of 2006, Carter alleges that Miller began to insult and demean him on a daily basis. Plaintiffs also allege that Miller would arbitrarily order Carter to return to VLS's offices while he was on a route for no distinguishable reason, only to then instruct him to return to his route. This, Carter alleges, in one instance forced him to miss his family's Thanksgiving celebration. Carter protested his treatment to Gwaltney twice between November and December of 2006. At this point, he reiterated a previous request to be transferred to the Mohenis branch in Franconia so that he would no longer have to interact with Miller, and informed Gwaltney that he could no longer work with Miller. Gwaltney allegedly responded by saying that VLS had "invested too much money in Chuck [Miller] to throw him under the bus," and that Carter "obviously ha[d] a decision to make." (Doc. No. 63 at 14.) On February 24, 2007, Carter claims that he resigned "due to the continued humiliation caused by Chuck Miller upon [him] and [Miller's] over the top attitude and management style." (Doc. No. 63-11, Ex. 5 at 1.)

### III. Procedural History

On October 31, 2008, Tawwaab filed suit in the United States District Court for the District of Columbia alleging that Defendants had discriminated and retaliated against him based on race in violation of Title VII and 42 U.S.C. § 1981. On March 6, 2009, Plaintiff Tawwaab's case was transferred to this Court. On June 10, 2009, Plaintiff amended his Complaint to join Carter as an additional plaintiff, who alleges discrimination based on race and retaliation in violation of 42 U.S.C. § 1981, as well as intentional infliction of emotional distress. Now

---

[3] Gwaltney does not recall the meeting taking place.

pending before the Court are Defendants' Motion for Summary Judgment (Doc. No. 52) and Plaintiffs' Motion for Leave to File Third Amended Complaint and for Joinder of Additional Party (Doc. No. 42).

## STANDARD OF REVIEW

Summary judgment is only appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). In a motion for summary judgment, the moving party discharges its burden by showing an absence of evidence to support the nonmoving party's case. *Celotex*, 477 U.S. at 325. The court must "draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded to particular evidence." *Masson v. New Yorker Magazine*, 501 U.S. 496, 520 (1991) (internal citations omitted). However, the party who bears the burden of persuasion on a particular claim must present legally sufficient evidence to support each element of his claim. "[A] complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial." *Id.*

To defeat a motion for summary judgment, the nonmoving party must come forward with affidavits or other similar evidence to show that a genuine issue of material fact exists. *See Matsushita Elec. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). While the evidence of the nonmoving party is to be believed and all justifiable inferences drawn in his or her favor, a party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences. *See Deans v. CSX Transp., Inc.*, 152 F.3d 326, 330-31 (4th Cir. 1998); *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985). Also, hearsay statements or conclusory statements

with no evidentiary basis cannot support or defeat a motion for summary judgment. *See Greensboro Prof'l Fire Fighters Ass'n, Local 3157 v. City of Greensboro*, 64 F.3d 962, 967 (4th Cir. 1995). Though courts need to be cautious when considering a motion for summary judgment in the employment discrimination context because motive is often a critical issue, summary judgment is still appropriate if the plaintiff cannot prevail as a matter of law. *See Jaudon v. Elder Health, Inc.*, 125 F. Supp. 2d 153, 160 (D. Md. 2000) (citing *Ballinger v. N.C. Agric. Extension Serv.*, 815 F.2d 1001 (4th Cir. 1987)).

## ANALYSIS

### I. Plaintiff's Motion for Leave to File Third Amended Complaint and for Joinder of Additional Parties

Pursuant to Federal Rules of Civil Procedure 15(a) and 16(b)(4) regarding liberal amendment of pleadings and the modification of a scheduling order for good cause, Plaintiffs seek leave to file a Third Amended Complaint to dismiss Count XVI as to all Defendants, dismiss all claims against Defendant Gwaltney, and join Mohenis as a defendant. Defendants consent to the dismissal of Count XVI and the dismissal of all claims against Defendant Gwaltney, but do not consent to Plaintiffs' request to join Mohenis as a party.

On March 25, 2009, the Court set May 11, 2009, as the deadline for joining additional parties and amending the complaint. (*See* Doc. No. 15.) The Court granted Plaintiff an extension until June 25, 2009, to join additional parties and amend the complaint. Plaintiffs filed the instant motion on December 15, 2009, more than six months after the extended deadline. Plaintiffs argue that they can demonstrate good cause for modifying the scheduling order so as to satisfy Rule 16(b)(4), and that joining Mohenis as a party satisfies the liberal requirements of Rule 15(a).

Federal Rule of Civil Procedure 16(b)(4) states that a scheduling order "may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). Under Rule 16(b), good cause exists where the moving party has diligently made efforts to meet court imposed deadlines. *See Rassoull v. Maximus, Inc.*, 209 F.R.D. 372, 374 (D. Md. 2002). The Fourth Circuit has noted that a finding of "good cause" is justified under Rule 16(b) where at least some of the evidence needed for a plaintiff to prove his or her claim did not come to light until after the amendment deadline. *See In re Lone Star Indus., Inc. Concrete R.R. Cross Ties Litig.*, 19 F.3d 1429, 1994 WL 118475, at *11 (4th Cir. Apr. 7, 1994) (finding abuse of discretion in the district court's refusal to allow amendment to add a new claim after scheduling order deadline). The factors to be considered in determining whether there is good cause or "excusable neglect"[4] include the "danger of prejudice to the non-moving party, the length of delay and its potential impact on judicial proceedings, the reason for the delay, and whether the movant acted in good faith." *Rothenberg v. Marriott Int'l, Inc.*, No. CCB-08-173, 2008 WL 687033, at *1 (D. Md. Feb. 29, 2008) (citing *Pioneer Inv. Serv. Co. v. Brunswick Assoc. Ltd. P'ship*, 507 U.S. 380, 395 (1993)). Courts in the Fourth Circuit deny leave to amend a complaint past the deadline established by a scheduling order where the moving party has been careless in developing his claims or where he has failed to satisfactorily account for his failure to do so. *Compare Whichard v. Specialty Restaurants Corp.*, 220 F.R.D. 439, 441 (D. Md. 2004) (denying plaintiff's motion to join an additional defendant five months after the court imposed deadline because plaintiff had ample notice before the deadline that the original defendant might not be

---

[4] Defendants also argue that Plaintiffs must satisfy Rule 6, which requires parties to show that their failure to comply with a scheduling order was not due to "excusable neglect." The "excusable neglect" standard under Rule 6 is coextensive with the "good cause" standard under Rule 16, and thus a finding that Plaintiffs have satisfied Rule 16 also satisfies the requirements under Rule 6.

the right party) *with Long v. Blair,* No. 2:09-CV-00349, 2010 WL 1930220 (S.D. W. Va. May 12, 2010) (holding that good cause existed where the plaintiff did not establish a sufficient evidentiary basis to support new claims until after the deadline for amending his complaint and moved to amend immediately after the new evidence came to light).

After a movant satisfies the good cause standard of Rule 16(b), he must pass the tests for amendment under Rule 15(a). *Rassoull v. Maximus, Inc.*, 209 F.R.D. 372 (D. Md. 2002). Rule 15(a) provides that a court should "freely give leave [to amend a pleading] when justice so requires." Fed. R. Civ. P. 15(a). The Fourth Circuit has held that:

> [t]he law is well settled that leave to amend a pleading should be denied only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would be futile. . . . Delay alone is an insufficient reason to deny leave to amend. Rather, the delay must be accompanied by prejudice, bad faith, or futility.

*Edwards v. City of Goldsboro*, 178 F.3d 231, 242 (4th Cir. 1999).

Defendants make no argument that they would be prejudiced by Plaintiffs' proposed amendment or that Plaintiffs have acted in bad faith. Instead, they argue that Plaintiffs' proposed complaint is futile. "Leave to amend should only be denied on the ground of futility when the proposed amendment is clearly insufficient or frivolous on its face." *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 510 (4th Cir. 1986). The Fourth Circuit interpreted this standard to mean that an amendment is futile if it would not survive a motion to dismiss. *See Perkins v. United States*, 55 F.3d 910, 916 (4th Cir. 1995). The Supreme Court has held that to survive a motion to dismiss, a complaint must contain sufficient factual matter, that when accepted as true, is sufficient to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has

facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

Plaintiffs contend that the proposed Third Amended Complaint is not futile because Mohenis and VLS may be considered a single employer for the purposes of adjudicating Title VII and § 1981 claims. An "employer" is defined under Title VII as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year . . . ." 42 U.S.C. § 2000e(b). Courts have routinely interpreted the term "employer" liberally, *see Baker v. Stuart Broad. Co.*, 560 F.2d 389, 391 (8th Cir. 1977), and have allowed plaintiffs who are employees of one entity to bring claims against parent or wholly-owned subsidiary corporations, as well as separate corporations that operate under common ownership and management, s*ee Lima v. Addeco*, 634 F. Supp. 2d 394, 400 (S.D.N.Y. 2009). To determine whether two entities constitute a single employer or integrated enterprise, courts consider four factors: (1) the interrelation of operations; (2) whether there is common management; (3) whether there is centralized control of labor relations; and (4) whether there is common ownership and financial control. *See, e.g., Baker*, 560 F.2d at 389. Centralized control of labor relations, the third factor, is the most important. *See Jarvis v. Chimes, Inc.*, No. RDB-06-1197, 2008 WL 623402, at *6 (D. Md. Mar. 4, 2008).

Plaintiffs argue that good cause exists under Rule 16(b)(4) because they were unaware of the extent of the interrelationship between Mohenis and VLS until the deposition of Nancy Alley, the financial vice president and EEO compliance officer for both companies, on December 7, 2009. During her deposition, Alley testified to a number of facts allegedly unknown

to Plaintiffs beforehand regarding the "intertwined financial, managerial, and operational functions of the two companies." (Doc. No. 42 at 3.) These facts include Alley's testimony that Mohenis owns one hundred percent of VLS's stock; that the two entities are controlled by the Strumingers; that Alley is the EEO compliance officer for both companies; that the funds for VLS employee paychecks are drawn from a Mohenis bank account; and that Mohenis performs a broad range of services for VLS that includes payroll, inventory purchasing, accounting, conducting criminal background checks for job applicants, drafting and dissemination of employee personnel policies, maintaining personnel files for salaried employees, training managers, and EEO compliance. Defendants contend that the extent of the relationship between Mohenis and VLS was easily ascertainable by Plaintiffs as early as August 18, 2009, when Defendants produced a number of VLS personnel documents that reference Mohenis, and at the latest by September 24, 2009, when Defendants produced VLS's EEO-1 reports. (*See* Doc. No. 47 at 4-5.)

The Court finds *Long* instructive. As was the case in *Long*, Plaintiffs in this case received documents indicating the closeness of the relationship between Mohenis and VLS on August 18, 2009, and September 24, 2009, already several months *after* the deadline established by the scheduling order. (*See* Doc. No. 48 at 4.) Furthermore, Plaintiffs noticed the depositions of the necessary parties, in this case David Struminger and Nancy Alley, almost immediately thereafter. (*See id.*) Plaintiffs deposed Struminger on November 17, 2009, and deposed Nancy Alley on December 7, 2009. At the conclusion of her deposition, Plaintiffs verbally requested Defendants' consent to join Mohenis as a defendant, which they refused. (*See id.*) Plaintiffs filed the present motion six days thereafter. (*See id.*). In addition, there is little risk of prejudice to Defendants, as

12

the proposed amendment merely adds an additional defendant in the case based on the same facts alleged in Plaintiffs' Second Amended Complaint. Because of the interrelationship of personnel operations and the management team, no further discovery will be required. The reason provided for the delay is reasonable, and there is no evidence of bad faith on the part of Plaintiffs. As such, the Court holds that Plaintiffs have demonstrated good cause under Rule 16(b)(4).

Under Rule 15(a), the Court finds that Plaintiffs' Amended Complaint is not futile because they have stated a facially plausible claim that VLS and Mohenis constitute a single employer or integrated enterprise. First, Mohenis handles payroll functions, insurance, purchasing, accounting, drafting and dissemination of employee policy guides, and maintains personnel records such that there is clearly an interrelation of operations between the two. (*See* Doc. No. 42 at 7.) The second and fourth prongs are easily satisfied, as Donald and David Struminger serve as the chief executive officer and president, respectively, of both companies, and VLS is entirely owned by Mohenis. (*See id.*) Furthermore, there is evidence in the record that there is centralized control of labor operations between Mohenis and VLS sufficient for Plaintiff to state a cognizable claim: (1) Mohenis and VLS share a personnel department; (2) Mohenis maintains the personnel files of VLS's management; (3) at least four current or former VLS employees, including Miller, have been transferred to or from other Mohenis locations without having to complete new employment applications; (4) Plaintiff Carter spoke with the general manager in Franconia about the possibility of being transferred to that Mohenis depot; and (5) David Struminger, president of both VLS and Mohenis, has participated in personnel decisions, such as deciding whether or not Plaintiff Carter was eligible for a pay raise. (*See* Doc. No. 48 at 9-10; Doc. No. 63, Gwaltney Dep. at 182-83.) As such, the Court finds that Plaintiffs'

claim against Mohenis is not "clearly insufficient or frivolous on its face." The Court will grant

Plaintiffs' motion to join Mohenis as a defendant accordingly.[5]

## II. Defendants' Motion for Summary Judgment on Tawwaab's Claims[6]

Plaintiff Tawwaab alleges that Defendants retaliated against him after he complained

about Walsh's lynching threat at WVCC by terminating his employment on November 1, 2006,

in violation of his rights under Title VII and 42 U.S.C. § 1981.[7] The Court analyzes a Title VII

retaliation claim using the three-step, burden-shifting scheme set forth by the Supreme Court in

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973).[8] *See Causey v. Balog*, 162

F.3d 795, 803 (4th Cir. 1998). Under the *McDonnell Douglas* framework, the plaintiff first must

establish a *prima facie* case of discrimination. *See McDonnell Douglas Corp.*, 411 U.S. at 802. A

prima facie case exists where: (1) the plaintiff engages in protected activity; (2) an adverse

employment action occurs against the plaintiff; and (3) there is a causal connection between the

protected activity and the employment action. *See Causey*, 162 F.3d at 803.

Once a plaintiff establishes a *prima facie* case of retaliation, the burden of production

---

[5] Defendants move for summary judgment on the claims contained in the Second Amended Complaint. As the Court has granted Plaintiffs' Motion for Leave to File a Third Amended Complaint, it will treat Defendants' Motion for Summary Judgment as applying to the Third Amended Complaint to the extent that it repeats the same claims as those of the Second Amended Complaint.

[6] Plaintiff Tawwaab does not contest his discrimination claims on summary judgment contained in Counts I and III in his Complaint. The Court grants summary judgment accordingly.

[7] Defendants claim that Tawwaab's Title VII retaliation claim must be dismissed for failure to exhaust administrative remedies because he did not check the "retaliation" box on his E.E.O.C. Charge, and did not allege a claim of retaliation in the body of the Charge. (*See* Doc. No. 52-2, Ex. A-1 at 1.) However, the E.E.O.C. explicitly included retaliation in its reasonable cause determination. (*See* Doc. No. 63, Ex. 11 at 1.) As such, to the extent Defendant argues that Tawwaab's retaliation claim is beyond the scope of his E.E.O.C. Charge, the Court does not agree. *See E.E.O.C. v. Gen. Elec. Co.*, 532 F.2d 359, 364-66 (4th Cir. 1976) (holding that an original E.E.O.C. charge is "sufficient to support . . . a civil suit under the Act for any discrimination . . . developed in the course of a reasonable investigation of that charge, provided such discrimination was included in the reasonable cause determination of the E.E.O.C.").

[8] The analysis is the same for retaliation claims arising under 42 U.S.C. § 1981. *See Jordan v. Alt. Res. Corp.*, 458 F.3d 332, 343-44 (4th Cir. 2006) ("With respect to [plaintiff's] claims for unlawful retaliation under 42 U.S.C. § 1981 . . . the applicable principles are the same as those for determining liability under Title VII.").

shifts to the defendant to present a legitimate, nondiscriminatory reason for the adverse employment action alleged. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). If the defendant succeeds in doing so, that will rebut the presumption of discrimination raised by the plaintiff's *prima facie* case. *See Stokes v. Westinghouse Savannah River Co.*, 206 F.3d 420, 429 (4th Cir. 2000) (citing *Burdine*, 450 U.S. at 255 n.10). The plaintiff then must "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Burdine*, 450 U.S. at 253. In the end, "[t]he plaintiff always bears the ultimate burden of proving that the employer intentionally discriminated against [him]." *Evans v. Tech. Applications & Serv. Co.*, 80 F.3d 954, 959 (4th Cir. 1996) (citing *Burdine*, 450 U.S. at 253).

Plaintiff Tawwaab's retaliation claim fails because he is unable to satisfy the first prong of the test, and thus is unable to make a *prima facie* case. Even though the Court can infer a causal connection between Tawwaab's protest of Walsh's comment at WVCC and his termination from the temporal proximity of the two events[9], and questions of material fact exist as to whether or not he suffered an adverse employment action, his claim fails to survive summary judgment because he is unable to show that he engaged in a protected activity. As Plaintiff is unable to establish a *prima facie* case, there is no need for the Court to examine whether or not Defendants had a legitimate, non-pretextual reason for terminating Tawwaab's employment.

---

[9] Temporal proximity gives rise to an inference of causality. *See Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (noting that some cases "accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a *prima facie* case").

The Opposition Clause within Title VII states that an employee only engages in protected activity if he opposes an actual "unlawful employment practice," 42 U.S.C. § 2000e-(3)(a), or an employment practice that the employee reasonably believes to be unlawful. *See Jordan v. Alt. Res. Corp.*, 458 F.3d 332, 338 (4th Cir. 2006). The test of whether an employee reasonably believes a practice to be unlawful is an objective one, and, as such, the issue may be resolved as a matter of law. *Id.* at 338-39. Defendants contend and Plaintiff concedes that, in the instant case, the only conceivable unlawful employment practice that Tawwaab could have been opposing was a hostile work environment created by Walsh's lynching threat. As such, Plaintiff would have to show that Tawwaab "complained about an actual hostile environment or, if there was not one, [that Tawwaab] could have reasonably believed there was one." *Jordan*, 458 F.3d at 339.

However, it is unnecessary to determine whether what Tawwaab complained about was an actual hostile work environment or what he reasonably perceived to be a hostile work environment. Even assuming, *arguendo,* that a hostile work environment existed or it was reasonable for Tawwaab to believe there was one, there is no basis for attributing Walsh's statement to VLS. "To satisfy the first element in a prima facie case of retaliation, [plaintiff] must show sufficient facts to impute the actions of [a customer] to her employer." *Folkerson v. Circus Circus Enters., Inc.*, 107 F.3d 754, 756 (9th Cir. 1997). Liability may be imposed on an employer for the actions of a customer or an employee where   (1) "an employer should reasonably anticipate that a plaintiff may become a victim, but fails to take action reasonably calculated to prevent the harassment," *Hylind v. Xerox Corp.*, 380 F. Supp. 2d 705, 717 (D. Md. 2005) (holding an employer liable for the actions of a customer where the employer had " knowledge that a male [customer] had previously harassed female employees other than the

plaintiff" and should "have anticipated that the plaintiff too would become a victim"); or (2) an employer "had actual or constructive knowledge of the existence of a [ ] hostile working environment and took no prompt and adequate remedial action." *Dennis v. County of Fairfax*, 55 F.3d 151, 155 (4th Cir. 1995) (internal quotations omitted).

Plaintiff fails to allege sufficient facts to attribute the actions of Walsh at WVCC to VLS. Tawwaab testified on deposition that he had delivered to WVCC approximately forty times without incident; as such, Defendants could not reasonably have known that Tawwaab might be a victim of future racial threats by Walsh or anyone else at WVCC. (*See* Doc. No. 63-34, Tawwaab Dep. at 175.) Furthermore, once Tawwaab informed his superiors at VLS of the incident with Walsh, other members of the management team assumed the responsibility of delivering to WVCC. (*See* Doc. No. 52 at 11.) While it may be that Tawwaab was never personally assured that he would be relieved from having to make deliveries to WVCC, as he contends, the fact remains that Tawwaab never had to return to WVCC as part of his duties. (*Id.*) Plaintiffs offer no evidence to the contrary. In addition, VLS initiated an investigation into the incident in which it obtained signed statements from Walsh and Lee, asked other supervisors who had delivered to WVCC if they had ever had any problems, and interviewed another employee Tawwaab asserted had been the target of abusive words by Walsh, which the employee denied. (*See* Doc. No. 64 at 14 n.11.) Thus, Walsh's abusive treatment of Tawwaab cannot be attributed to VLS because it was not reasonably foreseeable that a VLS employee would be subject to abuse at WVCC, and VLS acted appropriately to prevent future abuse from occurring once they learned of the incident. As such, Tawwaab fails to satisfy the first prong of the test, and the Court grants summary judgment as to Counts II and IV, all of Tawwaab's

remaining claims.

### III. Defendants' Motion for Summary Judgment on Carter's Claims

#### A. Discriminatory and Retaliatory Hostile Work Environment Under 42 U.S.C. § 1981 (Counts VI & XI)

In Count VI, Plaintiff Carter alleges that he was subjected to a race-based hostile work environment. To prevail on a claim of a racially hostile work environment, a plaintiff must establish that (1) he experienced unwelcome harassment, (2) the harassment was based on race, (3) the harassment was sufficiently severe or pervasive to alter the conditions of his employment and to create an abusive atmosphere, and (4) there is some basis for imposing liability on the employer. *See Baqir v. Principi*, 434 F.3d 733, 745-46 (4th Cir. 2006). Whether an environment is hostile or abusive must be determined by evaluating the totality of the circumstances. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 21, 23 (1993). In making that determination, the Court applies a subjective and objective test wherein "a plaintiff must demonstrate not only that [he] subjectively perceived [his] workplace as hostile, but also that a reasonable person would perceive . . . that it was objectively hostile." *Fox v. GMC*, 247 F.3d 169, 178 (4th Cir. 2001) (internal citations omitted). In determining whether the harassing conduct was objectively severe or pervasive, "[r]elevant considerations may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 184 (4th Cir. 2001) (internal quotation omitted). The Court's evaluation should not be "a mathematically precise test" where any one factor is dispositive, as "[t]he real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a

simple recitation of the words used or the physical acts performed." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 82 (1998).

In the instant case, Plaintiff alleges the following specific incidents of harassing conduct: (1) Miller referred to another employee, Wingate, as either a "black motherfucker" or "black bastard" in Carter's presence in April of 2006;[10] (2) Brian Holmes, another African-American employee, testified on deposition that he had heard Miller use the phrase "black bastards" on two or three occasions during 2004; (3) Miller kept a statue of what Plaintiff alleges is an African-American caddy with the appearance of a monkey on his desk and would place it in front of African-American employees as if to say, "[t]his is what I think of you"; (4) Miller referred to Areesha Meeks, another African-American employee as a "black bitch"; (5) Miller made jokes about the hairstyles of African-American employees on three separate occasions; (6) Miller occasionally referred to the route drivers as his "black Fresh Prince[s] of Bel-Air"; (7) Miller constantly used abusive and profane language that he directed overwhelmingly toward African-Americans; (8) Peres Turner, another African-American employee, took out a peace order against Miller after he threatened her with a gun; (9) Miller violently swept the materials off his desk during a meeting with Carter and Felton Williams, another African-American employee, hitting Williams in the head; and (10) Holmes recalls approximately five instances at the beginning of Miller's tenure as general manager where he said the problems he was experiencing were new to him because "[in his former position] in West Virginia . . . he didn't have brothers working for him." (*See* Doc. No. 63, Carter Dep. at 68-75, 77-78, 121, 137; *id.*, Holmes Dep. at

---

[10] Defendants concede that this incident occurred, but argue incorrectly that it is time-barred under a three-year statute of limitations. (*See* Doc. No. 52 at 33.) A four-year statute of limitations applies to claims brought under § 1981, and thus the Wingate incident is timely and may be considered on summary judgment. *See generally Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369 (2004).

21, 23-24, 80, 82, 86-87, 92.)

### 1.  Harassment "Based on Race"

Plaintiff Carter is unable to establish that all of the above incidents of abuse he alleges contributed to a hostile work environment were based on his race. "To establish a hostile environment claim, [Plaintiff] must show that 'but for' his race . . . , he would not have been the victim of the alleged discrimination." *Causey*, 162 F.3d at 801. "Discriminatory animus based on a protected trait can be shown by the employer's differential treatment of similarly situated employees outside of his protected class[ ]." *Baqir*, 434 F.3d at 746. While Plaintiffs suggest that Carter was subjected to a constant barrage of racially-based insults, most of what Carter experienced was race-neutral abuse wherein Miller called Carter and a number of his co-workers "dumb motherfuckers," "incompetent motherfuckers," "stupid bastards," "bastards," and "dumb bitch[es]." (Doc. No. 63, Carter Dep. at 119, 121-22, 126, 136, 194, 336; *id.*, Holmes Dep. at 25.) Plaintiff alleges that these facially race-neutral attacks are still actionable because they were overwhelmingly directed towards African-Americans, and Caucasian employees did not experience the same vitriol that Miller allegedly reserved for his African-American subordinates.

In the instant case, Carter fails to bring sufficient evidence to show that "but for" his race he would not have been subject to Miller's profanity. In contrast, there is substantial record evidence that Miller was indiscriminately abusive and belittling to all of his subordinates, regardless of race. (*See* Doc. No. 63, Carter Dep. at 119 ("Even though he's not being racial [and] he's not making any racial statements, [ ] he is continuing to call my subordinates dumb motherfuckers.").) Brian Holmes and Robert Smith, both African-American former employees of VLS, conceded that Miller's verbal abuse was not racially motivated, but was in actuality a

manifestation of his feeling of superiority over *all* of his subordinates, the majority of whom happened to be African-American. (*See* Doc. No. 63, Holmes Dep. at 55 ("He had [this] arrogance about him and it was pretty much to anybody that didn't do [their work] the way he thought it should be done. Ladies in the office who were Caucasian, Robert Carstens, they had a couple of issues."); *id.*, Smith Dep. at 22-23 ("I've witnessed him saying, you know, that kind of stuff to white people as well as anybody else. He just had a temper and sometimes he would go off, you know.").) Furthermore, Sandra Tierney, a white female employee, testified that Miller would regularly insult her and her daughter's intelligence, "cuss" at them, "yell[ ] and scream[ ]," and otherwise belittle them. (*See* Doc. No. 63, Tierney Dep. at 47-48; 76.) As such, Plaintiff has failed to prove that Miller's facially race-neutral insults such as "motherfucker" and "bastard" were racially motivated, and thus these incidents fail the second prong of the test and are not actionable.

However, Carter has identified a number of explicitly racial comments made by Miller that include his comments to Wingate and Meeks, his remarks about traditional African-American hairstyles, and his use of the phrase "black Fresh Prince[s] of Bel-Air." Defendants cite *Rose v. Son's Quality Food Co.* for the proposition that the addition of the word "black" to a race-neutral insult does not constitute race-based harassment that would support a hostile work environment claim. No. AMD 04-3422, 2006 WL 173690, at *4 (D. Md. Jan. 25, 2006). In that case, the Court found racial harassment that included the use of phrases such as "black dummy" and "black bitch" did not create a hostile work environment. While the *Rose* court held that those insults were not racial in nature, this Court has identified a number of other cases within the Fourth Circuit wherein the use of the word "black" as a modifier for otherwise racially-neutral

insults was, in fact, considered race-based harassment. *See, e.g., Finch v. Smighfield Packing Co.*, No. 5:99CV10-BR, 2000 WL 33682696, at *4 (E.D.N.C. Feb. 10, 2000) (holding that "unequivocal examples of racial animus" included instances when plaintiff was instructed to keep his "black ass" off the phone and was called a "black son of a bitch" and a "black motherfucker"); *Jenkins v. City of Charlotte*, No. Civ. A. 3:03CV44, 2005 WL 1861728, at *3, 11 (W.D.N.C. July 26, 2005) (holding that the use of the phrase "kicking [plaintiff's] black ass" constituted race-based harassment that should be considered on summary judgment). As such, the Court holds that the addition of the word "black" to otherwise race-neutral insults is an indicator that the individual is being targeted because of his race, and thus satisfies the "but for" prong of the *prima facie* test.

Defendants further contest Plaintiff's assertion that Miller's monkey statue was offensive because "it evoked historical depictions of African-Americans as monkeys and apes and in positions of servitude to, or as comic relief for, whites." (*See* Doc. No. 63 at 43.) The Fourth Circuit has repeatedly held that comparing an African-American to a monkey is a degrading and outrageous form of race-based harassment. *See, e.g.*, *Spriggs*, 242 F.3d at 189 ("To suggest that a human being's physical appearance is essentially a caricature of a jungle beast . . . is degrading and humiliating in the extreme."); *White v. BFI Waste Sys.*, 375 F.3d 288, 298 (4th Cir. 2004) (same). Drawing all inferences in favor of Plaintiff, the Court holds that the alleged constant display of the monkey statue and Miller's deliberate placement of it in front of African-American employees during at least one dispute is an act of race-based harassment to be considered on summary judgment.

Plaintiff also contends that an African-American employee named Peres Turner sought a

peace order against Miller after he physically threatened her and said that "if he had a gun, he would shoot [her]." (Doc. No. 63 at 45.) While Defendants have shown that Miller's general, race-neutral profanity was directed at all of his subordinates regardless of their race, there is no evidence that Miller ever physically threatened a white employee with violence. The same is true of the incident where Miller violently swept the items off of his desk, hitting an African-American employee in the process. Such disparate treatment is sufficient to infer that these threats and acts of violence were racially motivated so that they may be considered on summary judgment.

## 2. "Severe or Pervasive" Harassment

In order to create a hostile work environment, any harassment based on race must be "sufficiently severe or pervasive to alter the conditions of [ ] employment and [ ] create an abusive environment." *Baqir*, 434 F.3d at 745-46. The "standard for proving an abusive work environment is intended to be a very high one because the standard is designed to filter out complaints attacking 'the ordinary tribulations of the workplace.'" *Wang v. Metro. Life Ins. Co.*, 334 F. Supp. 2d 853, 864 (D. Md. 2004) (citing *Mackey v. Shalala*, 80 F.3d 954, 959 (4th Cir. 1996)). In order for a hostile work environment claim to survive summary judgment, the conduct at issue must be far more severe than that of "a merely unpleasant working environment," *Hopkins v. Balt. Gas & Elec. Co.*, 77 F.3d 745, 753 (4th Cir. 1996), and must be sufficiently "pervasive [so] as to become diffuse throughout every part of the . . . work environment in which plaintiff functioned." *Schweitzer-Reschke v. Avnet, Inc.*, 874 F. Supp. 1187, 1195 (D. Kan. 1995). As such, courts usually only allow hostile work environment claims to proceed where the discriminatory abuse is near constant, oftentimes of a violent or threatening nature, or has

impacted the employee's work performance.

In *Spriggs*, the plaintiff was exposed on a "continuous daily basis" to particularly severe racial insults made by a supervisor in which he called a number of African-American employees "monkey[s]", "dumb monkey[s]", and "ni * * * * *." 242 F.3d at 182 ("Far more than a 'mere offensive utterance,' the word 'ni * * * *' is pure anathema to African-Americans. Perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as 'ni * * * *' by a supervisor in the presence of his subordinates.") (internal quotations omitted). Similarly, in *Central Wholesalers, Inc.*, the Fourth Circuit reversed the lower court's grant of summary judgment and allowed the African-American plaintiff's hostile work environment claim to proceed where a number of her co-workers used the word "ni * * * *" in her presence on a *daily* basis, and two of her co-workers kept "blue-colored mop-head dolls in their offices . . . hanging from nooses which were tied around the dolls' neck[s]." 573 F.3d at 175. In *Amirmokri v. Balt. Gas & Elec. Co.*, the Fourth Circuit found that the alleged harassment was sufficiently severe or pervasive because an Iranian plaintiff was called "names like 'the local terrorist,' a 'camel jockey' and 'the Emir of Waldorf'" on an almost daily basis, he was denied company benefits, and he suffered an ulcer as a result of the stress. 60 F.3d 1126, 1131 (4th Cir. 1995). In *Demby v. Preston Trucking Co.*, the Court denied summary judgment where racial epithets were used repeatedly, the plaintiff experienced several incidents of disparate treatment, and his work space was vandalized with a painted swastika and a threatening and offensive phrase. 961 F. Supp. 873, 880 (D. Md. 1997). Finally, in *Collier v. Ram Partners, Inc.*, the court denied summary judgment where plaintiff was subjected to repeated racial epithets and physical threats. 159 F. Supp. 2d 889, 890 (D. Md.

2001). As such, courts in the Fourth Circuit allow hostile work environment claims to proceed where a combination of the four *Spriggs* factors is present.

In contrast, courts in the Fourth Circuit typically grant summary judgment where many of these factors are missing, such that the abuse plaintiff alleges created a hostile work environment is not particularly frequent, threatening in nature, or disruptive to his ability to perform his work responsibilities. In *Martin v. Merck & Co.*, the Court granted summary judgment on a hostile work environment claim where African-American employees were subjected to numerous incidents of serious abuse where the word "ni * * * *" was used in plaintiff's presence, a racially offensive cartoon was posted on an African-American employee's office door, an employee was taunted with a noose, another employee was told he needed to "go back to the jungle," and Ku Klux Klan material was shown to an African-American employee on the internet. 446 F. Supp. 2d 615, 627 (W.D. Va. 2006). In granting summary judgment, the Court held that the acts of harassment plaintiff experienced were insufficiently frequent because he could only identify eight acts that took place over the course of twenty years. *Id.* Similarly, in *Rose*, this Court granted summary judgment for defendant because plaintiff could only identify two relatively non-severe racial insults that were non-threatening, and that did not appear to adversely impact plaintiff's ability to do her job. 2006 WL 173690, at *4. The racial comments at issue in *Orenge v. Veneman* were similarly infrequent and non-threatening. 218 F. Supp. 2d 758, 767 (D. Md. 2002) (holding that repeated racial comments such as "whites will never trust blacks again," "blacks are trying to get a free ride," and "you guys don't pull your weight" did not rise to the level of severe or pervasive).

The Court finds that Plaintiff has alleged sufficient facts to support his hostile work

environment claim, and has identified approximately ten actionable incidents of harassment that took place between 2005 and 2007, while Carter worked under Miller's supervision: (1) the Wingate incident; (2) the presence of the monkey statue on Miller's desk; (3) several instances where Miller referred to the route drivers as his "black Fresh Prince[s] of Bel-Air" (4) Miller's comment to Areesha Meeks wherein he called her a "black bitch"; (5) three instances where Miller mocked traditional African-American hairstyles; (6) the incident wherein Miller threatened to kill Peres Turner with a gun; and (7) the incident where Miller threw the items off his desk, hitting Felton Williams in the head.[11] In applying the first of the *Spriggs* factors, this Court holds that a reasonable jury could find that Miller's abuse was sufficiently frequent to support a claim. The Court has identified approximately ten incidents of racial harassment over the course of two years, such that a question of material fact exists as to whether the harassment Carter experienced was so "pervasive [ ] as to become diffuse throughout every part of the . . . work environment in which [he] functioned." *Schweitzer-Reschke*, 874 F. Supp. at 1195. While there is certainly no allegation that Miller made racial comments on a daily or weekly basis, as

---

[11] Plaintiff also has identified two instances in 2004 where Miller called his employees "black bastards," and approximately five instances at the beginning of his tenure as general manager, presumably at some point in 2004 when he transferred to Landover, where he commented that the problems he was experiencing in the route department were attributable to the fact that his employees were African-American. (*See* Doc. No. 63, Holmes Dep. at 23, 81-82, 87.) Carter did not begin working for Miller until 2005, and there is no evidence in the record that he was present for, or even knew about, these incidents. While it is firmly established law that a hostile work environment may be supported by incidents of harassment that were witnessed by but not directed at a plaintiff, it is less clear that this Court may consider incidents that Plaintiff did not even know about, and that could not possibly have contributed to Plaintiff's subjective impression of the hostility of his work environment. *Spriggs*, 242 F.3d at 184 ("Although [Defendant] contends that conduct targeted at persons other than [Plaintiff] cannot be considered, its position finds no support in the law."). Other circuits have taken differing views on this issue. *Compare Rodgers v. W.-S. Life Ins. Co.*, 12 F.3d 668, 674 (7th Cir. 1993) (holding that a court may consider "the lexicon of obscenity that pervaded the environment of the work place both before and after the plaintiff's introduction into its environs") *with Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 335 (6th Cir. 2008) (holding that the court can only "consider evidence of other acts of harassment *of which a plaintiff becomes aware* during the period of his or her employment"). This Court need not take a position on this issue, as the facts alleged by Plaintiff are sufficient to support his claim even if these particular comments are not considered on summary judgment.

has been true in many cases where courts have allowed hostile work environment claims to proceed, the objective inquiry "is not, and by its nature cannot be, a mathematically precise test." *Harris*, 510 U.S. at 22.

Furthermore, several of the above-mentioned incidents were particularly offensive and involved at least some kind of physical threat. Miller said of Wingate that he was "going to kick that black bastard's ass and drag his motherfucking ass across the fucking parking lot," Peres Turner sought a peace order after Miller threatened to shoot her, and Miller struck Felton Williams with items he violently threw off his desk. (Doc. No. 63 at 7.) In addition, assuming that Miller's monkey statue was intended to parody African-Americans, courts have repeatedly held that comparing an African-American to a monkey is a particularly severe and egregious practice. And finally, there is evidence in the record that Miller's harassment impacted Carter's ability to do his job. After the Wingate incident, Carter was so upset that he was unable to return to work, and went out on a route in order to get away from Miller and to calm down. When he recounted this incident to Gwaltney, he insisted on doing so in a neutral meeting place away from the office. As such, this Court finds that a reasonable jury could find that Carter's work environment was both objectively and subjectively hostile. While the number of racial incidents are fewer than those in many cases where courts have denied summary judgment, the presence of the other three *Spriggs* factors creates a question of material fact as to the severity of the conduct that cannot be resolved on summary judgment.

### 3. Imputing Liability to VLS

"Employers may avoid strict liability for a supervisor's harassment where no adverse employment action was taken against the employee and the employer can demonstrate that (1)

the employer exercised reasonable care to prevent and correct promptly any harassing behavior and (2) the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer." *Sheikh v. 7-Eleven, Inc.*, No. AW-03-2270, 2004 WL 3584088, at \*7 (D. Md. Dec. 17, 2004). The adequacy of VLS's response once it was aware of the harassment is a factual issue. *See Paroline v. Unisys Corp.*, 879 F.2d 100, 105 (4th Cir. 1989). In *Paroline*, after a Unisys employee complained of sexual harassment by a coworker, Unisys responded by launching a formal investigation, disciplining the harasser, and requiring him to seek counseling. The employee was further instructed that any further incidents of harassment would result in his immediate termination. *See id.* Despite these efforts, the Court in that case found that Unisys' actions were intended to be nothing more than "a slap on the wrist," and held that a genuine issue of fact existed as to whether the company's actions were reasonably calculated to end the harassment. *See id.*

In the case at bar, VLS's response to Plaintiff Carter's repeated complaints does not even begin to approach the level of Unisys' actions in *Paroline*. Carter alleges that he complained about Miller's behavior on at least seventeen different occasions, including after the Wingate incident, when he spoke with Gwaltney and insisted on a written apology from Miller. (*See* Doc. No. 63 at 9.) There is no evidence in the record that VLS initiated any kind of investigation into Miller's conduct, nor is there evidence that Miller ever faced any kind of discipline as a result. Carter maintains that he never received the apology he was promised, and was allegedly told by Gwaltney that "VLS was 'the sandbox' of company chief executive officer and president David and Donald Struminger and that if he was 'going to play in their sandbox, he would have to play by their rules.'" (Doc. No. 63 at 14.) As such, the Court finds that VLS's actions were not

reasonably calculated to end the harassment Carter faced. There is sufficient evidence to impute Miller's actions to VLS, and the Court denies summary judgment as to Count VI accordingly.

Defendants do not address Plaintiff's claim for a hostile work environment based on retaliation in their motion for summary judgment. As such, the Court will deny summary judgment as to Count XI.

### B. Discriminatory Denial of Promotion, Transfer, and Training Under 42 U.S.C. § 1981 (Counts VII & VIII)

Plaintiff Carter also alleges he was denied a promotion, training opportunities, and a transfer to another Mohenis branch because of his race. Failure to promote, transfer, or train are disparate treatment claims that can be supported by either direct or circumstantial evidence. Demonstrating discrimination with circumstantial evidence requires the application of the burden-shifting framework set forth in *McDonnell Douglas*. *See Chung Shin v. Shalala*, 166 F. Supp. 2d 373, 376 (D. Md. 2001). In order to establish a *prima facie* case that a plaintiff was denied a promotion or a transfer because of race, he or she must prove that: "(1) he is a member of a protected group; (2) the defendant had an open position for which the plaintiff applied or sought to apply; (3) he was qualified for the position; and (4) he was rejected under circumstances giving rise to an inference of discrimination." *Janey v. N. Hess Sons, Inc.*, 268 F. Supp. 2d 616, 624 (D. Md. 2003); *see also Venugopal v. Shire Labs.*, 334 F. Supp. 2d 835, 846 (D. Md. 2004). In order to establish a *prima facie* case that he was denied training opportunities, a plaintiff must prove that: (1) the plaintiff is a member of a protected class; (2) the defendant provided training to its employees; (3) the plaintiff was eligible for the training; and (4) the plaintiff was not provided training under circumstances giving rise to an inference of discrimination. *See Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649-50 (citing *Pafford*

*v. Herman*, 148 F.3d 658, 667 (7th Cir. 1998). If the plaintiff is able to make a *prima facie* case of discrimination, the burden shifts to the defendant to show that he or she had a legitimate, non-pretextual reason for taking the disputed employment action. *See Chung Shin*, 166 F. Supp. 2d at 376.

### 1. Failure to Promote and Transfer Claims

Plaintiff fails to make a *prima facie* case of failure to promote or transfer because he fails to provide evidence that there was an open position into which he could have been promoted or transferred so as to satisfy the second prong of the test. *See, e.g., Janey v. N. Hess Sons, Inc.*, 268 F. Supp. 2d 616, 624 (D. Md. 2003) (granting summary judgment where "[p]laintiff fail[ed] to forecast sufficient evidence that [defendant] had an open position . . . and, therefore, [could not] fulfill the second element of the *prima facie* case"). Plaintiff argues that because VLS lacked a formal process of posting promotional opportunities for which employees could apply, and instead relied on an informal "tapping" system whereby employees were "tapped" by management for advancement, the application prong of the *prima facie* case is relaxed and a plaintiff can be treated as if he had actually applied for a specific position even if he did not formally do so. It is well established that an employee is not required to formally apply for a position when opportunities are not posted or otherwise made known to employees, as it is impossible to require an employee to apply for a position he did not know about. *See Williams v. Giant Food, Inc.*, 370 F.3d 423, 431 (4th Cir. 2004) (internal quotation omitted) ("[I]f the employer fails to make its employees aware of vacancies, the application requirement may be relaxed and the employee treated as if she had actually applied for a specific position."). However, the Court rejects Plaintiff's interpretation of the case law wherein he argues that not

only is a plaintiff excused from showing that he applied for a position, but he is also "not [even] required to demonstrate that a specific open position actually existed," whether he knew about it or not. (*See* Doc. No. 63 at 56.) Such an argument stresses reasonableness. An employer cannot be found to have discriminated against an employee by not promoting him or transferring him into a position that does not even exist. Even in cases where an employee has been excused from having to show that he applied for a specific position, employment opportunities actually existed even if the employee did not know about them. *See, e.g., Williams*, 370 F.3d at 432-33; *Moore v. Leavitt*, 2007 WL 5123539, at *7 (D. Md. 2007).

As a result, Plaintiff Carter's failure to promote and transfer claims must fail. Carter can point to no specific available position at VLS or any other Mohenis depot for which he was qualified. It is undisputed that the only positions higher than Carter's in the VLS hierarchy were the Assistant General Manager, General Manager, and Vice President positions, all of which were filled. (*See* Doc. No. at 27 n. 24.) Carter alleges that he had heard from Tim Sanderson, a route supervisor at a Mohenis depot located in Franconia, Virginia, that a position would soon be open because he planned to resign. (*See* Doc. No. 63 at 56.) In contrast, Robert Mills, general manager of the Franconia division, submitted an affidavit asserting that there were no vacancies open at the time Carter sought a transfer. (*See id.*) Plaintiff contends that Mills' affidavit directly conflicts with Carter's deposition testimony such that a dispute of material fact exists that would require a jury to weigh each party's credibility. The Court disagrees. Assuming that Carter's deposition testimony is true, and he was in fact informed that a route supervisor position in Franconia would come open at some unspecified point in the future, this is still insufficient to create a question of material fact because he offers no evidence that the position actually *did*

become available during the time he worked at VLS. In contrast, Mills offers testimony that he did not hire *any* permanent, full-time route supervisors between October 2005 and April 2007 – two months after Carter left VLS. (*See* Doc. No. 52-5 at 2.) While the Franconia depot did hire a replacement at some point in 2006 for Bill Gormours, a route supervisor who informed management he would be retiring, the replacement did not end up staying at Commercial Linen Service because Gormours decided not to retire.

Even if there were an open position, Plaintiff is unable to show that he was rejected from this hypothetical position under circumstances giving rise to an inference of discrimination. *See Autry v. N.C. Dep't of Human Res.*, 820 F.2d 1384, 1386 (4th Cir. 1987) (holding that a plaintiff would have to show that "[he] was not promoted because of his race, not that [he] was a member of [a protected group] and was not promoted"). Gormours' temporary replacement was African-American, which creates an inference that Carter was not denied the same position because of his race, even though he did not apply for or even know of this vacancy. In addition, there is substantial evidence that Plaintiff has not been able to rebut Defendant's contention that Carter had not succeeded in his current position, which is "widely recognized as [a] valid, non-discriminatory bas[is] for any adverse employment decision." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 258-59 (1981). Furthermore, the promotion system Carter claims is discriminatory led to two prior promotions in 2003 and 2005. (*See* Doc. No. 52 at 2-3.) Plaintiffs ask the Court to speculate that, despite Defendants' evidence to the contrary, a higher position was available at VLS or another unidentified Mohenis branch, Carter would have been interested in and qualified for such a position, and that but for Carter's race, he would have been promoted or transferred to this, as yet, unidentified position. Such speculation is insufficient to support a

*prima facie* case of discriminatory denial of promotion or transfer. *See McNeal v. Montgomery County, Md.*, No. 07-1323, 2009 WL 122607, at *6 (4th Cir. 2009) ("[A] plaintiff must present sufficient evidence, direct or circumstantial, for a reasonable jury to conclude, by a preponderance of the evidence, that race, color, religion, sex, or national origin was a motivating factor for any employment practice." (internal quotations omitted)). The Court grants summary judgment as to Counts VII and VIII accordingly.

### 2. Failure to Train

Plaintiff further alleges, even though it is not an independent cause of action in the Complaint, that Plaintiff Carter was denied the opportunity to participate in VLS's Fast Track management training program because of his race. After reviewing the evidence in the light most favorable to Plaintiff, it is clear that he has presented no evidence of a denial of training that gives rise to an inference of discrimination, and thus he fails to make a *prima facie* case. There is evidence in the record that Carter received substantial management training before he was promoted into the route department superintendent position he held at the time of his resignation. (*See* Doc. No. 64 at 28.) He admits that the thirteen-week management training program in which he participated was in fact more comprehensive than the training that would have been provided by the Fast Track program. (*See id.*) Furthermore, Carter is unable to demonstrate that he was treated differently because of his race in being denied participation in the Fast Track program, as there is no evidence that anyone from VLS, of any race, *ever* participated in the Fast Track program. Nor is there evidence that individuals outside of the protected class were preferred when the company determined who would be allowed to participate, thus giving rise to an inference of discrimination. In *Chika v. Planning Research Corp.*, the court found that the

plaintiff's denial of training claim failed because he was unable to establish the race of other employees who were allegedly treated more favorably. 179 F. Supp. 2d 575, 585 (D. Md. 2002). Evidence of "discriminatory motive is critical." *Fisher v. Md. Dep't of Housing & Cmty. Dev*., 32 F. Supp. 2d 257, 262 (D. Md. 1997). As such, Plaintiff's denial of training claim is not actionable.

## C. Retaliatory Refusal to Promote and Transfer Under 42 U.S.C. § 1981 (Counts XII & XIII)

Plaintiff Carter also alleges that he was retaliated against for opposing Plaintiff Tawwaab's firing by being denied a promotion or transfer. As discussed in section II.B, *supra*, a plaintiff must establish a *prima facie* case by showing that (1) the employee engaged in protected activity, (2) the employee suffered an adverse employment action, and (3) a causal connection exists between the employee's complaint and the adverse action. *See Causey v. Balog*, 162 F.3d 795, 803 (4th Cir. 1998). If a plaintiff succeeds in making a *prima facie* case, the burden shifts to the employer to prove that the employer had legitimate, non-pretextual reasons for taking the action in question. *Id.*

Even if Plaintiff were able to make a *prima facie* case, Carter is unable to show that VLS's reasons for not promoting or transferring him were mere pretext by rebutting VLS' assertion that there were no available positions into which Carter could have been promoted or transferred. An employer cannot be held liable for failing to promote or transfer an employee to a position that does not exist. Thus, for the reasons discussed in the prior section, the Court grants summary judgment as to Counts XII and XIII.

**D. Discriminatory and Retaliatory Constructive Discharge Based on Race Under 42 U.S.C. § 1981 (Counts IX & XV)**

Plaintiff Carter further alleges that he was constructively discharged by VLS because of his race. To prevail on a discrimination claim under § 1981, a plaintiff must show that he is a member of a racial minority, that his employer's termination of his employment was because of his race, and that the discrimination was intentional. *See Jordan v. Alt. Res., Corp.*, 458 F.3d 332, 335 (4th Cir. 2006). Carter resigned, and thus must show that he was constructively discharged. "Constructive discharge occurs when 'an employer deliberately makes an employee's working conditions intolerable and thereby forces him to quit his job.' A plaintiff must prove (1) deliberateness of the employer's action and (2) intolerability of the working conditions." *Bryant v. Lucent Techs., Inc.*, 307 F. Supp. 2d 726, 742 (D. Md. 2004) (quoting *Holsey v. Armour & Co.*, 743 F.2d 199, 209 (4th Cir. 1984)).

Plaintiff Carter is unable to satisfy the second prong of the test and establish that the discrimination he faced was so intolerable that "a reasonable person in the plaintiff's position would have felt compelled to resign." *Bryant*, 307 F. Supp. 2d at 742-43. Constructive discharge claims are held to a high standard, and "[e]ven truly awful working conditions may not rise to the level of constructive discharge." *Hill v. Verizon Md., Inc.*, No. RDB-07-3123, 2009 WL 2060088, at *13 (D. Md. July 13, 2009). "Dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not intolerable as to compel a reasonable person to resign." *Proa v. NRT Mid-Atl., Inc.*, 618 F. Supp. 2d 447, 468 (D. Md. 2002); *see also Williams v. Giant Food Inc.*, 370 F.3d 423, 434 (4th Cir. 2004) ("[Plaintiff] alleged that her supervisors yelled at her, told her she was a poor manager . . . , chastised her in front of customers, and once required her to work with an injured back. [The Court] agree[s]

35

with the district court that these allegations, even if true, do not establish the objectively intolerable working conditions necessary to prove constructive discharge.").

Carter's constructive discharge claim fails because he is unable to show the intolerable nature of the abuse he faced. The "severe and pervasive" standard required to state a hostile work environment claim is lower than the "intolerability" standard required for a constructive discharge claim, and thus a finding that Carter's hostile work environment claim is actionable does not necessitate a finding that he was constructively discharged. *See Tutman v. WBBM-TV, Inc./CBS, Inc.*, 209 F.3d 1044, 1050 (7th Cir. 2000) ("[W]orking conditions for constructive discharge must be even more egregious than the high standard for hostile work environment."); *see also Spencer v. Wal-Mart Stores, Inc.*, 469 F.3d 311, 317 (3d Cir. 2006) ("To prove constructive discharge, the plaintiff must demonstrate a greater severity of pervasiveness of harassment than the minimum required to prove a hostile work environment."); *Griffin v. Delchamps, Inc.*, 176 F.3d 480 (5th Cir. 1999) (same). Carter is only able to state the minimum required to sustain his hostile work environment claim, and thus has insufficient evidence that he was subjected to a truly intolerable work environment that would leave a reasonable person with no choice but to resign. Carter's allegations that Miller called him race-neutral names, inconvenienced and undermined him in front of his superiors, and used sporadic racial epithets, even if true, are insufficient to establish intolerable conditions. As such, the Court will grant summary judgment as to Counts IX and XV.

### E. Retaliation for Complaining About Discrimination Under 42 U.S.C. § 1981 (Count X)

Plaintiff Carter also states a generic claim for retaliation in violation of 42 U.S.C. § 1981. As discussed in section II.B, *supra*, a plaintiff must establish a *prima facie* case by showing that

(1) the employee engaged in protected activity, (2) the employee suffered an adverse employment action, and (3) a causal connection exists between the employee's complaint and the adverse action. *See Causey v. Balog*, 162 F.3d 795, 803 (4th Cir. 1998). If a plaintiff succeeds in making a *prima facie* case, the burden shifts to the employer to prove that the employer had legitimate, non-discriminatory reasons for taking the action in question. *Id.*

Carter's retaliation claim fails because even assuming, *arguendo*, that Carter were able to establish that he engaged in protected activity, he is unable to establish that he was the victim of an adverse employment action. While an alleged adverse employment action need not be so severe and pervasive that it alters the terms or conditions of employment, it nonetheless must be materially adverse. *See Martin v. Merck & Co.*, 446 F. Supp. 2d 615, 637 (W.D. Va. 2006) (citing *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006)). As such, a plaintiff is not required to show that the adverse action is in fact actionable discrimination, but "need only show that he experienced an action that well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry.*, 548 U.S. at 68. Plaintiff contends that a jury could conclude that a reasonable worker would be dissuaded from making a charge of discrimination by (1) Miller's demeaning and belittling remarks that include the phrase "dumb motherfucker," (2) the fact that he allegedly undermined Carter's authority in front of his subordinates, (3) his insistence that Carter needlessly perform arbitrary and time-consuming tasks, and (4) Defendants' failure to promote or transfer Carter. (*See* Doc. No. 63 at 35.)

Carter fails to establish that he was subjected to an adverse employment action that is sufficiently materially adverse so as to satisfy the second prong of the *prima facie* test. This Court has held that demeaning and disparaging comments by a supervisor, such as those directed

at Carter by Miller, do not constitute an adverse employment action. *See, e.g., Adams v. Upper Chesapeake Med. Ctr., Inc.*, No. AMD 08-346, 2009 WL 997103, at *4 (D. Md. 2009) ("personal slights are not adverse employment actions"); *Blount v. Thompson*, 400 F. Supp. 2d 838, 842 (D. Md. 2004) (stating that "disparaging remarks made by a supervisor do not state an adverse employment action"). Other circuits have also held that a change in job responsibilities, such as Miller's alleged insistence that Carter perform arbitrary and time-consuming tasks, does not constitute a materially adverse action if the new tasks "are not dirtier, more arduous, less prestigious, . . . objectively inferior, [or] possess[ing] [of] any analogous attribute." *Stephens v. Erickson*, 569 F.3d 779, 791 (7th Cir. 2009). In the instant case, Plaintiff alleges that Miller would frequently and arbitrarily order Carter to return to VLS's office while he was in the middle of a route for no legitimate business reason, only to require that Carter leave the VLS office and return to his route. However, they are able to point to only one specific instance where Miller engaged in the conduct alleged, which caused Carter to miss a family Thanksgiving celebration. (*See* Doc. No. 63, Gwaltney Dep. at 171.) While undoubtedly irritating, this example of Miller's conduct is not analogous to the "dirtier, more arduous, less prestigious, [and] objectively inferior" task reassignment that courts have found necessary to constitute an adverse employment action. Furthermore, as stated above, Carter has failed to show that VLS's failure to promote him or transfer him to another VLS depot is attributable to anything other than the fact that there were no open positions. As a result, Plaintiff is unable to state a *prima facie* case of retaliation, and this Court will grant summary judgment as to Count X.

**F. Retaliatory Denial of a Raise Under 42 U.S.C. § 1981 (Count XIV)**

Plaintiff Carter also alleges that he was retaliated against for complaining about

discrimination and harassment by being denied a raise. To set forth a *prima facie* case of retaliatory denial of a pay raise by circumstantial evidence, a plaintiff must demonstrate that (1) he engaged in protected activity; (2) he was denied a pay raise; and (3) there is a causal connection between his protected activity and his employer's denial of a raise. As with any other case of retaliation, the burden shifts to the defendant to prove that his or her reason for the adverse action is legitimate and non-discriminatory, and then back to the plaintiff to prove that the proffered reason is pretextual.

Plaintiff Carter's claim for retaliatory denial of a raise fails because, even assuming, *arguendo*, that he were able to make a *prima facie* case, he is unable to rebut VLS's legitimate, nondiscriminatory reason for not providing him with a pay raise. Plaintiff alleges that Gwaltney offered Carter a raise in August 2006, which Gwaltney later withdrew in response to Carter's unwillingness to fire Tawwaab. Defendants argue in response that Gwaltney never offered Carter a raise, but merely said that he would look into whether a raise was a possibility. However, at VLS, route supervisors are paid a percentage of the money earned on the routes they supervise and have no opportunity to earn individual pay increases. (*See* Doc. No. 52 at 48.) Gwaltney testified both in his individual capacity and as a Federal Rule of Civil Procedure 30(b)(6) designee for VLS that Carter's income "is based on . . . what he might sell and earn commissions on. . . . As a route supervisor the pay structure is what the pay structure is and per se there are no individual raises." (Doc. No. 64, Gwaltney Dep. at 181-82; *see also id.*, VLS Dep. at 161 ("The route supervisors are compensated based on . . . the average of the routes.").) Plaintiff attempts to manufacture a dispute of material fact by pointing to other language in Gwaltney's testimony as the VLS 30(b)(6) designee that implies that VLS had no "pay scale by position" and pay is

"discretionary." (*See id.*, VLS Dep. at 146-47.) However, this language is not inconsistent with Gwaltney's other testimony. If a route supervisor's salary is determined by the money earned on the routes he supervises, the salary brought home by different route supervisors will vary depending on the success of each route such that there is no "pay scale by position." Furthermore, David Struminger also testified on deposition that route supervisors are compensated based on a fixed formula derived from the money earned on their routes, and Plaintiff Carter himself testified that route supervisors were paid a percentage of their routes. (*See id.*, Struminger Dep. at 261; Carter Dep. at 164.)

As such, the only way VLS could deliberately increase the amount of money a route supervisor earned is by recalculating his route so that the volume of business he supervised was greater. Gwaltney testified that he

> honored Kenny's request [for a raise] and [he] sent a memo to Mr. Struminger regarding an increase in [Carter's] pay during a rerouting period that they were not prepared to do at which time his pay would have gone up . . . [Struminger] indicated that that was not our pay structure and that he couldn't make modifications to our pay structure for an individual.

(*Id.*, Gwaltney Dep. at 182-83.) Plaintiff fails to provide any evidence that VLS's inability to recalculate the routes he supervised was tied to his resistance to Miller's firing of Tawwaab. Carter is unable to point to any situation where an individual who did not engage in protected activity received an increase in pay due to a route recalculation. *See, e.g., Obi v. Anne Arundel County, Md.*, 28 F. App'x 333, 336 (4th Cir. 2002) (holding that a plaintiff "failed to rebut the [defendant's] proffered reason" for increasing employees' level of pay by failing to show that plaintiff's treatment was "disproportionate with individuals who did not engage in protected activity"). As such, Plaintiff has failed to put forth sufficient evidence of a causal connection,

and this Court will grant summary judgment as to Count XIV.

**G.  Race Discrimination Under 42 U.S.C. § 1981 (Count V)**

In Count V of the Complaint, Plaintiff alleges a generic discrimination claim under 42 U.S.C. § 1981 where he repeats his claims brought in Counts X, XI, XII, and XV. In doing so, he contends that Defendants subjected him to a "racially hostile work environment, retaliate[ed] against him for complaining about and opposing discrimination, den[ied] him transfers, den[ied] him a raise and constructively discharge[ed] him, on account of his race." (Compl. ¶ 84.) Each of these individual allegations have been discussed in detail above, and the Court will grant summary judgment as to Count V accordingly.

<u>**CONCLUSION**</u>

For the foregoing reasons, the Court will GRANT in part and DENY in part Defendants' Motion for Summary Judgment and GRANT Plaintiffs' Motion for Leave to File a Third Amended Complaint and for Joinder of Additional Party.  As such, the only claims in the Third Amended Complaint that remain outstanding are Counts VI and XI. A separate Order will follow.


   July 28, 2010                                                /s/                             
       Date                                          Alexander Williams, Jr.
                                                     United States District Judge